# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

**Robert Lee Bailey,**                              04-CV-1397 (DWF/SRN)

      **Plaintiff,**

**v.**                                             <u>**REPORT AND**</u>
                                                   <u>**RECOMMENDATION**</u>
**Sgt. Andrew Schmidt, Officer Garmen,**
**E.R.U. Team led by Sgt. Young, Officer**
**Blauert, Unknown Officers, Patrick**
**McGowan, Unknown Animal Control**
**Officer,**

      **Defendants.**

---

Robert Lee Bailey, <u>pro se</u>

C. Lynn Fundingsland, Esq., on behalf of City of Minneapolis Defendants

Patricia R. Cangemi, Esq., on behalf of Federal Defendants

Toni A. Beitz, Esq., on behalf of Sheriff Patrick D. McGowan

---

SUSAN RICHARD NELSON,  United States Magistrate Judge

The above-entitled matter comes before the undersigned on Defendant Patrick McGowan's Motion for Summary Judgment (Doc. No. 64), Defendants Andrew Schmidt, Officer Garmen, the E.R.U. Team, and Officer Blauert's Motion for Summary Judgment (Doc. No. 83), Plaintiff's Motion Requesting Denial of Defendant Sheriff Patrick D. McGowan's Motion for Summary Judgment (Doc. No. 104), and Plaintiff's Motion Requesting Stay On All Proceedings (Doc. No. 111).  These motions have been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636 (2000) and District of Minnesota Local Rule 72.1.

I.     **BACKGROUND**

A.     **Plaintiff's Criminal Arrest and Charges**

On August 15, 2003, Sergeant Andrew Schmidt of the Minneapolis Police

Department swore an affidavit before the Honorable Hennepin County Judge Steven A.

Pihlaja in which Schmidt stated, inter alia:

> Within the last seventy two hours, your affiant met with two females who stated that they had been promoted in prostitution by Robert Lee Bailey . . . . Victim one stated that she met Bailey approx. one year ago. . . . Bailey took her to the Chicago, IL area and then tried to force victim one into prostitution. Bailey stated he was going to be her pimp.  When she refused Bailey beat her severely. . . .  Victim one fled to Minneapolis but she was located by Bailey.  Bailey forced her into prostitution in Minnesota and also trafficked her to Iowa for prostitution. . . . Bailey frequently assaulted Victim one and had her follow a strict set of rules to prevent her from leaving. . . . Victim one has seen other prostitutes at Bailey's residence at 2638 Colfax Ave. N.  Victim one states that one of the prostitutes with Bailey at the house is only 17 years old.  Victim one states that Bailey has taken nude photos and videos of her and that they are kept at the house.  Victim one has also seen Bailey in possession of firearms which he conceals on his property.  Bailey also has been seen by the victim in possession of marijuana and crack cocaine and the victim has heard Bailey making drug deals on the phone. . . . Additionally, Bailey has 5 pitbulls in the house that are very aggressive.  The dogs are usually kept locked up.  Victim one states that Bailey also has his prostitutes commit acts of prostitution in the house on "incall" dates.
>
> Victim two stated that she met Bailey approximately one month ago. She had no place to stay and Bailey took her in and had her work in prostitution and give him all of the proceeds.  Victim two had been assaulted by Bailey and also saw Bailey in possession of a black colored handgun with a wooden handle.  Victim two also stated that Bailey had a 17 year old female prostitute at his house and was conducting prostitution calls in the house. . . . Victim two stated that Bailey told her he was going to take her out of state for prostitution.
>
> . . . . I ran [Bailey's] criminal history and discovered that he had several arrests and convictions for narcotics offenses and robbery.  Bailey also had an illegal firearms arrest in Chicago.  Bailey was also convicted on a drug offense and a bribery offense while he was incarcerated in the Joliet Correctional facility in Illinois.  I also saw that Bailey had been arrested in Lyons, IL on 11/28/02 for domestic battery as Victim one had stated.

(Doc. No. 85 Ex. A at 2.)   Schmidt also discussed in his affidavit how he had confirmed

a variety of things the victims had stated.  (Id. at 2-3.)  This included calling a phone

number belonging to Bailey (and identified by the victims) and asking for an incall, to

which request he was told by the woman who answered the phone to go to 2638 Colfax

Avenue North—Bailey's house.  (Id.)  Schmidt stated that a nighttime search was

necessary because, "Prostitution and narcotics activity is highest at night.  Also, the

cover of darkness will allow officers to approach in a concealed nature to prevent the

destruction of evidence."  (Id. at 4.)  He also requested an unannounced search:

> The suspect has several violent felony convictions including narcotics and
> robbery crimes.  The suspect is supposed to be in possession of firearms
> and five pitbulls that are very dangerous.  The unannounced entry would
> allow officers a much greater level of safety to rapidly enter before the
> suspect can arm himself or release the pitbulls.  Also, the unannounced entry
> would help to prevent the destruction of evidence.

(Id.)

Based upon Schmidt's affidavit, on August 15, 2003, Judge Pihlaja issued a

search warrant to Schmidt to enter without announcement of authority the premises

owned by Plaintiff located at 2638 Colfax Ave North in Minneapolis and four vehicles

owned by Plaintiff to search for firearms, narcotics, money from criminal transactions,

and a variety of items related to operating a prostitution business.  (Doc. No. 85 Ex. A at

5.)  Specifically, the search warrant authorized a search for nine categories of property:

> 1. Firearms, ammunition, and firearms accessories.
> 2. Narcotics including, but not limited to, cocaine and marijuana.
> 3. Notes, ledgers, writings documenting prostitution activity.
> 4. Photographs, videos, cameras, and film used to document prostitution
> activity.
> 5. Money and other criminal proceeds.
> 6. Bank[ ] statements, bank ledgers, money orders, and wire transfer
> receipts, and other writings documenting criminal proceeds.
> 7. Receipts, ledgers, writings, and other documentation of interstate travel.
> 8. Clothing, jewelry, and other items used in prostitution.

3

9. Computers, phones, pagers, and other electronic items used to facilitate prostitution.

(Id.)

The warrant execution in this matter commenced with a forced entry into the premises, led by a special entry team.  At a briefing held just prior to the execution, officers had been advised of the reasons that the warrant had been obtained and were told of certain perceived dangers relating to the search, including the reported presence of firearms and five potentially aggressive pit bulls in the residence.  The briefing was attended by approximately 15 officers, including state troopers, [and] the entry team . . . .

United States v. Bailey, Doc. No. 32 in Civ. No. 03-370 ADM/AJB, available at 2004

U.S. Dist. LEXIS 1968, at *3 (D. Minn. Jan. 7, 2004) (Boylan, M.J.), report and

recommendation adopted, Doc. No. 49, available at 2004 U.S. Dist. LEXIS 1031 (D.

Minn. Jan. 27, 2004) (Montgomery, J.)[1]

Between 9:00 p.m. and 10:00 p.m. on August 15, 2003, Schmidt, along with state

and federal officers, executed the search warrant.  (Doc. No. 84 at 1.)  In response to an

interrogatory by Defendants, Plaintiff explained that when he first heard the police enter

his house he was in his upstairs bathroom, and he

went out on the roof since the window was right by my toilet, to try and get a look as to what was happening.  When the individuals outside I.D. themselves as officers and ordered me to put my hands on my head, I complied. They then ordered me to move back toward the window, I complied.  They then ordered me to go back through the window, I complied. The E.R.U. team in my bathroom had turned out the lights and snatched me in while I was half way through the window coming in hands first.  Their snatching me in this manner left me unable to have support or balance with my legs so once I was fully snatched in I fell immediately to the floor.  I was order[ed] by the E.R.U. team to spread my arms and legs, I complied.  Once I did so, they started stomping, kicking and beating me in the head, face, neck, stomach and ribs.

---

[1] The Court takes judicial notice of the findings of fact and conclusions of law adjudicated in Plaintiff's criminal proceeding.

4

(Doc. No. 85 Ex. D at 4-5.)  Plaintiff claims that at one point in the alleged beating, he "momentarily blacked out."  (Compl. ¶¶ at 4-7.)  Plaintiff avers that he "had to receive medical attention" for these injuries.  (Id. ¶ 7.)

Plaintiff alleges that after they entered Plaintiff's house, Sergeant Young and the E.R.U. team of the 4th Precinct "violently shot" and killed all but one of his dogs; Plaintiff claims that, when shot, the dogs were trying to "run and hide" from the officers.  (Id. at 2 ¶¶ 1-3.)  Defendants concede they shot and killed four of the five pit bulls they encountered when executing the search warrant.  (Doc. No. 84 at 3-4.)

According to Plaintiff, the search of the house also resulted in damage to furniture and fixtures.  (Compl. at 2 ¶ 11.)  Plaintiff further alleges that officers failed to secure the windows on his house which caused him "to be robbed blind."   (Id. ¶ at 14.) In responding to an interrogatory by Defendants, Plaintiff identifed the damaged property:

> Outer screen door, inner screen door, front door, frame around door and wall in which it was [encased].  My precious animals, including the youngest and pregnant one, my plants including my 51/2 foot palm tree was uprooted and or snatched out without being replanted, my walls had holes knocked in them, coupled with blood stains on the walls as well as the floors, heat vent casings were ripped out and not put back in, food such as cereal, flour, sugar, etc. was poured out in my kitchen sink and all over the counters and floors, personal documents and papers and clothing were ransacked through and scattered all over the place, chairs to my dining room set were broken and damaged, my bathroom sink and the cabinet mirror above it was ripped away from the supporting wall, my shower curtain and rod was torn down, dresser in one bedroom was destroyed as the drawers were smashed, the mattress in the mentioned bedroom were flipped and turned over without being put back in order, grape jelly was squeezed out of the bottle and sprayed all over my master bedroom's carpet, the dresser, the window ledge and splattered dots and specs were on the door, walls and every place else, the walls in the upstairs hallway were stained with foot prints and dented from the kicking pressure, my house was also burglarized as a result of the officers not having my windows secure[d] in which most commons electric

> items such as TVs, DVD players and stereo equipment was lost.  I also have
> a complete recording digital studio in which a total loss was suffered.  I also
> had a tool box stolen.  The officers also snatched storm window screens out
> of one of my windows and tore my electric garage door off its working track.

(Doc. No. 85 Ex. C at 10-11.)

The execution of the search yielded marijuana, illicit photographs, videotapes,

documentation of prostitution activity, money (including bills marked by the police as

part of an undercover vice operation in the house), crack cocaine, and a handgun.

(Doc. No. 86 ¶ 7.)  Plaintiff claims the officers conducted a warrantless search and

"never had a search warrant to provide me with and never left one when they were

done."  (Compl. at ¶¶ 14-15.)  After the search, Plaintiff was arrested for being a felon in

possession of a firearm, taken to the First Precinct and then, after he requested medical

attention, he was transported to Hennepin County Medical Center (HCMC).  (Doc. Nos.

85 at 8; 88 at 13-16.)  According to Plaintiff, Defendant Garmen struck Plaintiff's "chin

with his fist while [Plaintiff] was handcuffed in the back seat of the S.U.V. on the way

back from [HCMC]" where he had been examined.  (Id. at ¶¶ 24-25.)  Plaintiff was

received at the Hennepin County Adult Detention Center (ADC) at 4:28 a.m. on August

16, 2006 and a state judge found probable cause to detain him at 11:25 a.m. that same

day and set bail in the amount of $50,000.  (Doc. No. 67 ¶ 2.)  On August 18, 2003,

state charges (Control No. 03217642) were filed against Plaintiff for solicitation,

inducement, and promotion of prostitution and being a felon in possession of a firearm.

(Doc. No. 68 Ex. D.)

Plaintiff's dog had been taken by animal control officials on August 15, 2003 but

the dog was later released to a Jeanette Harvey on August 19, 2003.  (Doc. No. 85 ¶

10.)  Somehow, the dog was thereafter returned to the house prior to August 21, 2003.

(Doc. No. 89 ¶¶ 19-22.)  On August 21, 2003, Officer Michael Young answered a report

of a burglary at 2638 Colfax Avenue North.  (Compl. at 3 ¶¶ 1-2.)  In responding to the

burglary call, the officer encountered Plaintiff's remaining dog and shot and killed the

dog.  (Id. ¶ 3.)

On September 2, 2003, Plaintiff posted his bond and was released from the

ADC.  (Doc. No. 67 ¶ 3.)  On September 17, 2003, Plaintiff was again arrested, this time

on charges related to using a phone at the ADC to tamper with witnesses.  (Doc. No. 67

Ex. C.)  The September 19, 2003 state criminal complaint (Control No. 03252419)

charges that, while at the ADC, Plaintiff made terroristic threats and threatened

retaliation against persons who provided information to law enforcement officials in

connection with his August 15, 2003 arrest.  (Doc. No. 68 Ex. E.)  Following his arrest

on September 17, 2003, Plaintiff was held until released on October 21, 2003 to U.S.

Marshals to face federal charges related to his August 15, 2003 arrest.  (Doc. No. 67 ¶

5.)

As a result of these federal charges, Plaintiff was later indicted in the United

States District Court for the District of Minnesota on charges of, inter alia, transporting

persons to engage in prostitution in violation of 18 U.S.C. § 2421 and being a felon in

possession of a firearm in violation of 18 USC § 922(g)(1), 924(a)(2).  See Doc. No. 10

in United States v. Bailey, Civ. No. 03-370 ADM/AJB (D. Minn. Docketed Nov. 6, 2003).

Plaintiff later challenged the validity of the underlying search warrant.  On January 7,

2004, the Court found:

The residence search warrant was issued on August 15, 2003, and was

7

based upon sufficient probable cause as stated in the Affidavit of Sgt. Andrew Schmidt and as determined by Hennepin County District Court Judge Steven A. Pihlaja.   The warrant properly and sufficiently identified the locations to be searched and the items to be seized.  The search warrant in this matter was lawfully issued and there is no requirement for suppression of evidence seized pursuant to the warrant.

United States v. Bailey, Doc. No. 32 in Civ. No. 03-370 ADM/AJB, available at 2004

U.S. Dist. LEXIS 1968, at *7-*8 (D. Minn. Jan. 7, 2004) (Boylan, M.J.), report and

recommendation adopted, Doc. No. 49, available at 2004 U.S. Dist. LEXIS 1031, at *5-

*6 (D. Minn. Jan. 27, 2004) (Montgomery, J.)  Thereafter, a jury found Plaintiff guilty of

two counts of transporting a person to engage in prostitution in violation of 18 U.S.C. §

2421 and one count of being a felon in possession of a firearm in violation of 18 USC §

922(g)(1), 924(a)(2).  See id. at Doc. No. 62 (Docketed Feb. 3, 2004).

Plaintiff claims that on September 23, 2003, he discovered that Defendant

Schmidt had "harbored a fugitive of justice, concealed her identity by including her and

her testimony as being victim number two in his affidavit of sworn oath in attempts to

maliciously procure a search warrant to come and violate my constitutional rights."

(Compl. at 3 ¶¶ 15-19.)

**B.** **Plaintiff's Civil Action**

On March 26, 2004, Plaintiff filed a civil action that purports to be a Bivens[2]

action and to state claims pursuant to 42 U.S.C. § 1983 for redress of "the deprivations

of civil rights secured to [him] by the Constitution of the United States of America" under

---

[2] A Bivens action is one brought directly under the United States Constitution against a federal official acting in his individual capacity for alleged violations of constitutionally protected rights.  See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).

the 4th, 5th, 8th, and 14th Amendments.  (Compl. at 1 ¶¶ 22-28.)  His claims primarily

stem from the events described above occurring on August 15 and 21, 2003.  (Id. at 2-

3.)  These charges arguably include the use of excessive force, false arrest and

detention, property damage, seizure of his property in the act of killing his dogs,

trespass, "abuse of process," and related state law violations.  (Id. at 1-3.)  Plaintiff also

charges that Defendant McGowan and his investigators acted in concert with

Defendants Blauert and Schmidt to detain him on false charges stemming from the

September 19, 2003 incident.  (Id. at ¶¶ 9-12.)

On March 2, 2005, Defendant McGowan moved for summary judgment in his

favor on all of Plaintiff's claims.  (Doc. No. 64.)

On March 21, 2005, the Court dismissed Plaintiff's claims against the federal

agents named in Plaintiff's Complaint (the Bivens action).  (Doc. No. 78.)  The

remaining Defendants, Defendant McGowan separately, now move the Court for

summary judgment in their favor on Plaintiff's claims against them.  (See Doc. Nos. 64

& 83.)  On March 31, 2005, the remaining defendants moved for summary judgment.

(Doc. No. 83.)

On June 21, 2005, this Court denied, because they were incomplete or untimely,

Plaintiff's motions for leave to amend his pleadings to name the unnamed defendants

and to allege that Defendant McGowan failed to properly train and supervise staff at the

Hennepin County Adult Detention Center and failed to investigate Plaintiff's charge of

false detention.  (Doc. No. 96 at 2-5.)  In denying the motions, this Court found that one

of the motions did not include a copy of the proposed amended complaint as required

by the local rules of the Court.  See D. Minn. L.R. 15.1 ("A party who moves to amend a

9

pleading shall file such motion and shall attach a copy of the amended pleading to the

motion.")  The Court found that Plaintiff filed the other two motions after the deadline set

in the pre-trial scheduling order for filing such motions and after the deadline for

completing all discovery.  (Doc. No. 96 at 2-3.)  The Court did, however, grant Plaintiff

additional time to file responses to Defendants' summary judgment motions: "Plaintiff

must respond to Defendants' Motions for Summary Judgment on or before July 20,

2005."  (Doc. No. 96 at 5.)

On July 5, 2005, Plaintiff appealed the denial of his motion to amend to the

district court but did not object to the Court-imposed July 20, 2005 response deadline.

(Doc. No. 97.)  On July 14, 2005, Plaintiff filed a response to Defendant McGowan's

summary judgment motion.  (Doc. No. 105.)  On August 26, 2005, the Honorable

District Court Judge Donovan W. Frank denied Plaintiff's appeal and affirmed this

Court's Order denying his motion to amend his Complaint.  (Doc. No. 110.)  As of the

date of this Order, Plaintiff has not filed a response to Defendants Andrew Schmidt,

Officer Garmen, the E.R.U. Team, and Officer Blauert's Motion for Summary Judgment

(Doc. No. 83).

## II.    PARTIES' POSITIONS

### A.    McGowan's Motion for Summary Judgment

In support of his motion for summary judgment, Sheriff Patrick D. McGowan

(hereafter McGowan) submits an affidavit in which he states that he "did not personally

participate in any investigation preceding the arrests or in the arrests of the plaintiff

Robert Lee Bailey on August 15, 2003, or September 17, 2003."  (Doc. No. 69 at 1.)  He

also states that after an investigation of the relevant records, "no one from the Hennepin

County Sheriff's Office participated in the investigations which preceded the filing of the state criminal complaints dated August 18, 2003, and September 19, 2003." (Id. at 2.) McGowan submits affidavits and exhibits to affidavits in support of his position that Plaintiff was brought before a state judge about seven hours after his arrival at the ADC. (Doc. No. 66 at 3.)  That judge found probable cause to detain Plaintiff based on the felony gun possession and promotion of prostitution allegations against him.  (Id.)

McGowan argues that to sustain a § 1983 claim against him in his individual capacity, Plaintiff must establish that McGowan "personally caused a deprivation of plaintiff's constitutional rights."  (Doc. No. 66 at 6.)  McGowan argues that each of Plaintiff's detentions at the ADC met the constitutional standards for such detentions in that his warrantless arrests were reviewed promptly by a state judge who found probable cause existed for each arrest and subsequent detention.  (Id. at 6-7.)  Finally, McGowan argues that he cannot be sued in his official capacity because Plaintiff has failed to alleged that the conduct complained of resulted from an unconstitutional policy or custom.  (Id. at 8.)

In his response, Plaintiff concedes that the facts are as McGowan states (Doc. No. 105 at 1) but argues that "this is so as a result of this Court denying Plaintiff's motion to amend his pleadings, which would have identified Sheriff McGowan's lack of supervision over his deputies and defective policy in securing audio recorded evidence." (Id.)  Plaintiff's response does not address McGowan's role in the August 15, 2003 arrest or detention.  Instead, Plaintiff contends that McGowan violated his constitutional rights concerning the September 19, 2003 state complaint, which Plaintiff references by its "control number," 03252419.  (Id. at 6.)  Plaintiff claims the failure of the ADC to

record the terroristic phone call that he allegedly made from the ADC is  evidence that supports his charge that McGowan failed in his role as supervisor of the ADC.  (Id. at 2-6.)

McGowan replies that, first of all, Plaintiff is arguing that McGowan is liable based upon a claim that he tried to include in his Complaint but failed to do so when the Court, on July 21, 2005, rejected as untimely his bid to amend his Complaint to include a charge that Defendant McGowan failed to properly train and supervise staff at the ADC and failed to investigate Plaintiff's charge of false detention.  (Doc. No. 108 at 1.) Moreover, McGowan argues that even if such a claim existed, no jailer at the ADC had any duty to take affirmative steps to assist Plaintiff is disproving the terroristic threat allegations made by witnesses to the criminal conduct underlying the August 18, 2003 state charges.  (Id. at 2.)

**B.     Defendants Andrew Schmidt, Officer Garmen, the E.R.U. Team, and Officer Blauert's Motion for Summary Judgment**

Defendants Andrew Schmidt, Officer Garmen, the E.R.U. Team, and Officer Blauert (hereafter MPD Defendants) construe Plaintiff's three page Complaint as arguably charging the remaining Defendants (i.e., not including McGowan) with the following federal constitutional deprivations (as incorporated by the Fourteenth Amendment to the U.S. Constitution): use of excessive force, false arrest and detention, property damage, seizure of his property in the act of killing his dogs, trespass, "abuse of process," and any state law violations.  (Doc. No. 84 at 8-19.)  MPD Defendants contend that their force was reasonable, Plaintiff's detention was pursuant to probable cause and judicial findings, any property damage was justified given the subject matter

of the warrant and nature of execution of the warrant, the killing of Plaintiff's dogs was justified given the circumstances, the trespass claim is barred because the entry was pursuant to a valid search warrant, excessive force claims are not treated as an abuse of substantive due process rights, and any remaining state law claims are barred by official immunity to which the officers are entitled.  (Id.)  As of the date of this Report and Recommendation, Plaintiff has not responded to Defendant's motion for summary judgment.

## III.    DISCUSSION

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).

In response to a motion for summary judgment, "the non-moving party" must "go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c) & (e)).  "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."  Fed. R. Civ. P.

56(e).  The evidence and all reasonable inferences are viewed in the light most

favorable to the non-moving party.  Dorsey v. Pinnacle Automation Co., 278 F.3d 830,

834-35 (8th Cir. 2002).  A dispute about material facts is genuine only "if the evidence is

sufficient to allow a reasonable jury to return a verdict for the non-moving party."

Landon v. N.W. Airlines, Inc. 72 F.3d 620, 624 (8th Cir. 1995).  If the non-moving party

"fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial," then

Rule 56(c) requires the entry of summary judgment against such party.  Celotex, 477

U.S. at 322-23.

        To hold a defendant liable as an individual under 42 U.S.C. § 1983, a plaintiff

must prove: (1) the defendant's conduct deprived him of constitutional rights, and that

(2) the defendant's actions were taken under color of state law.  See Jennings v. Davis,

476 F.2d 1271, 1275 (8th Cir. 1973).  "A supervisor cannot be held liable, on a theory of

respondeat superior, for an employee's unconstitutional actions. . . . The supervisor

must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye

for fear of what [he or she] might see."  Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995)

(citations omitted).  If the charge is improper training or supervision of a subordinate, the

plaintiff must show "that the supervisor had notice that the training procedures and

supervision were inadequate and likely to result in a constitutional violation."  Tlamka v.

Serrell, 244 F.3d 628, 635 (8th Cir. 2001).

        The doctrine of qualified immunity "shields government officials from suit
        unless their conduct violates a clearly established constitutional or statutory
        right of which a reasonable person would have known."  A claim of qualified
        immunity triggers a two-part inquiry: "'whether the plaintiff has alleged the
        deprivation of an actual constitutional right at all, and if so, ... whether that

14

> right was clearly established at the time of the alleged violation.'"  When the
> qualified immunity defense is raised during the summary judgment stage,
> "the official's conduct must be viewed through the prism of Rule 56—that is,
> [the court] must take as true those facts asserted by [the] plaintiff that are
> properly supported in the record."  Thus, "'if there is a genuine dispute
> concerning predicate facts material to the qualified immunity issue, there can
> be no summary judgment.'"  After the predicate facts are established, "the
> reasonableness of the official's conduct under the circumstances is a
> question of law."

Johnson v. Crooks, 326 F.3d 995, 1006 -07 (8th Cir. 2003).

"[A] municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978).  A governmental policy, custom, or practice may rise to the level of a "law" and be actionable under § 1983 if the practice results in constitutional deprivations "persistent and widespread" enough to be "so permanent and well settled" as to have "the force of law."  Id.  For § 1983 liability to attach based upon a government policy, custom, or practice, a plaintiff must prove: (1) the existence of a continuing, widespread, and persistent pattern of unconstitutional conduct; (2) deliberate indifference to or tacit authorization of such conduct; and (3) that plaintiff's injury resulted from the application of the policy, custom, or practice.  Jane Doe "A" ex rel. Jane Doe "B" v. Special Sch. Dist., 901 F.2d 642, 646 (8th Cir. 1990).

## A.   Defendant Patrick McGowan's Motion for Summary Judgment (Doc. No. 64)

Plaintiff sues Sheriff McGowan in both his individual and official capacities. (Compl. ¶¶ 9-11.)  The Court recommends that McGowan be granted summary judgment in both of these capacities for the reasons set forth below.  First, Plaintiff has

not presented any admissible evidence in response to McGowan's showing that neither he nor any Hennepin County law enforcement official was involved in the execution of the search of Plaintiff's house or in his apprehension.  Further, despite McGowan's summary judgment motion and the evidence proffered in support of that motion, Plaintiff has presented no evidence that any Hennepin County law enforcement officer, much less the Sheriff, was involved in the investigations which preceded the filing of the August 15, 2003 or September 15, 2003 state criminal complaints filed against Plaintiff.

Second, the Court concurs with McGowan that Plaintiff's response is entirely premised—as conceded by Plaintiff—on the existence of legal claims and factual allegations concerning McGowan's conduct in his official capacity that are not part of his Complaint and which were the subject of Plaintiff's prior effort to amend his Complaint which was denied by this Court on June 21, 2005.  (See Doc. No. 105 at 1-6.)  "'The law of the case doctrine prevents the relitigation of a settled issue in a case and requires courts to adhere to decisions made in earlier proceedings'" and "'applies to issues decided implicitly as well as those decided explicitly.'"  Mosley v. City of Northwoods, 415 F.3d 908, 911 (8th Cir. 2005) (quoting Kan. Pub. Employees Ret. Sys. v. Blackwell, Sanders, Matheny, Weary & Lombardi, L.C., 114 F.3d 679, 687 (8th Cir. 1997).  The Court finds that its June 21, 2005 Order prevents Plaintiff from now claiming that McGowan failed to properly train and supervise staff at the ADC and failed to investigate Plaintiff's charge of false detention.  This determination is not altered because his motion to amend was denied as untimely rather than addressed on its merits.  See Prof'l Mgmt. Assocs., Inc. v. KPMG LLP, 345 F.3d 1030, 1032 (8th Cir. 2003) (per curiam) ("'[D]enial of leave to amend constitutes res judicata on the merits of

16

the claims which were the subject of the proposed amended pleading.'  This is so even

when denial of leave to amend is based on reasons other than the merits, such as

timeliness" (citations omitted)).

Second, a suit against a person in his "official capacity" is a suit against the

municipality.  <u>Kentucky v. Graham</u>, 473 U.S. 159, 165 (1985).  To state a claim against

a municipality, a plaintiff must prove that a municipality policy or custom caused the

constitutional violation.  <u>Kuha v. City of Minnetonka</u>, 365 F.3d 590, 603 (8th Cir. 2004).

The Court finds that the operative Complaint fails to include any factual allegations "by

which one could begin to draw an inference that the conduct complained of . . . resulted

from an unconstitutional policy or custom," and, thus, Plaintiff's assertion that

McGowan, acting in his official capacity, violated Plaintiff's constitutional rights does not

even meet the minimum pleading requirements to survive a motion to dismiss much

less a motion for summary judgment.  <u>Doe v. Sch. Dist. of Norfolk</u>, 340 F.3d 605, 614

(8th Cir. 2003).

Third, even if the claims that McGowan failed to properly train and supervise staff

at the ADC or that he failed to investigate Plaintiff's charge of false detention were

included in Plaintiff's Complaint, McGowan produces uncontested evidence that, even if

somehow jailers at the ADC had discovered Plaintiff was making criminal calls from the

ADC, they would have been required by the ADC's policy and custom to refer the matter

to a law enforcement agency for an investigation.  (Doc. No. 3.)

Fourth, a violation of an internal policy does not constitute an actionable claim

brought pursuant to 42 U.S.C. § 1983.  <u>See</u> <u>Booker v. City of St. Louis</u>, 309 F.3d 464,

467 (8th Cir. 2002), cert. denied, 540 U.S. 811 (2003); <u>Ebmeier v. Stump</u>, 70 F.3d 1012,

1013 (8th Cir. 1995).  Finally, jailers at the ADC had no duty to investigate Plaintiff's

protestations of innocence to his September 17, 2003 arrest or the September 19, 2003

charges for making terroristic threats.  Baker v. McCollan, 443 U.S. 137, 145-46 (1979)

("[W]e do not think a sheriff . . . . charged with maintaining custody of the accused

named in the warrant [is] required by the Constitution to perform an error-free

investigation of such a claim.  The ultimate determination of such claims of innocence is

placed in the hands of the judge and the jury."); Patterson v. Von Riesen, 999 F.2d

1235, 1241 (8th Cir. 1993) (noting that where the plaintiff claimed that prison "wardens

breached a duty to investigate his wrongful conviction claims and to recommend that he

be paroled on that basis," the court "kn[e]w of no federal constitutional duty requiring

prison wardens to investigate such claims").

The Court finds that there are no genuine issues of material fact for trial and

Defendant is entitled to summary judgment as a matter of law.  Thus, the Court

recommends granting Defendant Patrick McGowan's Motion for Summary Judgment

(Doc. No. 64).

**B.   Defendants Andrew Schmidt, Officer Garmen, the E.R.U. Team, and
      Officer Blauert's Motion for Summary Judgment (Doc. No. 83)**

Plaintiff's three page Complaint arguably charges the remaining Defendants (i.e.,

not including McGowan) with the following constitutional violations (as incorporated by

the Fourteenth Amendment): use of excessive force, false arrest and detention,

property damage, seizure of his property in the act of killing his dogs, trespass, and

"abuse of process."  All of these claims should be dismissed because Plaintiff has not

responded to Defendant's motion for summary judgment which is properly supported

with admissible evidence and because Plaintiff's failure to respond is in direct violation of this Court's Order mandating his response by July 20, 2005 (Doc. No. 96 at 5.)  While he argues in several places in his responses to Defendants' interrogatories that he knows of people who will provide testimony in support of his claims (Doc. No. 85 Ex. C), Plaintiff has not filed with the Court a sworn affidavit from any of these persons. Moreover, the Court is not required to pick through Plaintiff's discovery responses (the majority of which are only before the Court because supplied by Defendants); Plaintiff must set forth an argument in opposition to Defendants' motion which is supported by the requisite admissible evidence.  See Fed. R. Civ. P. 56(e).

Further, Plaintiff's failure to respond to the Defendants Andrew Schmidt, Officer Garmen, the E.R.U. Team, and Officer Blauert's motion for summary judgment is a violation of a prior court order issued in this case.  On June 21, 2005, in ruling on several of Plaintiff's nondispositive motions, including one to stay these proceedings, this Court ordered Plaintiff to "respond to Defendants' Motions for Summary Judgment on or before July 20, 2005."  (Doc. No. 96 at 5.)  While Plaintiff filed a timely objection to some portions of the June 21, 2005 Order, he did not object to the July 20, 2005 mandatory response date.  (See Doc. No. 97.)  Minnesota District Local Rule 72.2(a) states that a party must object to a magistrate judge's order "[w]ithin 10 days after being served with a copy of the Magistrate Judge's order" or "not thereafter assign as error a defect in the Magistrate Judge's order to which objection was not timely made."  By not objecting to the response deadline set forth in this Court's Order, Plaintiff waived his right to appeal that decision, and his response was due July 20, 2005.  In addition, each of Plaintiff's claims fails as a matter of law for the reasons set forth below.

## 1.    Excessive Use of Force

"[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  Graham v. Connor, 490 U.S. 386, 396 (1989).  To be constitutional, however, any force must be "objectively reasonable in light of the facts and circumstances" confronting the officer. Wilson v. City of Des Moines, 293 F.3d 447, 451 (8th Cir. 2002).[3]  Furthermore, "[i]n addition to the circumstances surrounding the use of force," courts "may also consider the result of the force" used.  Crumley v. City of St. Paul, 324 F.3d 1003, 1007 (8th Cir. 2003); see Patzner v. Burkett, 779 F.2d 1363, 1371 (8th Cir. 1985).

Defendants Andrew Schmidt, Officer Garmen, the E.R.U. Team, and Officer Blauert concede that Plaintiff had a general right to be free from excessive force.  (Doc. No. 84 at 10.)  They argue, however, that the force used was reasonable under the circumstances.  (Doc. No. 84 at 11-12.)  The officers involved executed a search based on suspicion of felony offenses and on a search warrant later adjudged to have been based upon probable cause.  The officers entering Plaintiff's house had been briefed that a gun and multiple aggressive pitbulls were on premises and that drugs were present.  Under the circumstances, the forced and speedy entry into the house was reasonable.

---

[3] The Court's analysis is conducted pursuant to those protections provided by the Fourth and Fourteenth Amendments to the U.S. Constitution.  To the extent Plaintiff attempts to allege a substantive due process claim under the Fifth and Fourteenth Amendments for his excessive force claims, these claims are barred because "all claims that law enforcement officers have used excessive force . . . in the course of an arrest . . . of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." Graham, 490 U.S. at 395.

In response to an interrogatory by Defendants, Plaintiff explained that when he first heard the police enter his house he was in his upstairs bathroom and "went out on the roof since the window was right by my toilet, to try and get a look as to what was happening."  (Doc. No. 85 Ex. C at 4-5.)  Under the circumstances, it was reasonable for officers to believe that Plaintiff was attempting to flee and to pull him in from off his roof.  "When an arrestee flees or resists, some use of force by the police is reasonable."  Foster v. Metropolitan Airports Comm'n, 914 F.2d 1076, 1082 (8th Cir. 1990).  Plaintiff has offered no admissible evidence suggesting that he received any contemporaneous or subsequent serious or permanent injury as a result of officers subduing him on the night of August 15, 2003.

On the other hand, Defendants have submitted the medical report from Plaintiff's examination by HCMC doctors which took place between approximately 1:20 a.m. and 3:00 a.m. on August 16, 2003.  (Doc. No. 85 Ex. F.)  Those records indicate that Plaintiff was diagnosed with a rib contusion and acute alcohol intoxication.  (Id. at 2.)  While Plaintiff reported to the HCMC with rib and nose pain and had dried blood on his face, doctors found no lacerations to his face and, according to Plaintiff's HCMC medical records, Plaintiff left the hospital "pain free."  (Id.)

Plaintiff claims an officer hit him while being transported from the HCMC to the ADC.  (Compl. ¶¶ 23-25.)  The officer accused of striking Plaintiff as Plaintiff was being transported from HCMC to the ADC has filed an affidavit in which he denies he hit Plaintiff.  (Doc. No. 88 ¶ 12.)  Further, after Plaintiff arrived at the ADC, he was examined by a nurse at the ADC as part of his intake into that facility after Plaintiff complained of sore ribs.  (Doc. No. 87 ¶¶ 4-5.)  While Plaintiff did ask to go back to the

hospital at that time, the records show that he refused analgesics when they were offered to him by the nurse.  (Id. Ex. A.)  In her affidavit, the nurse states that it is her conclusion based upon a review of the records at HCMC and her own contemporaneous examination that Plaintiff suffered no serious injuries from his arrest and detention on August 15 and 26, 2003.  (Id. ¶ 7.)  Plaintiff's intake record contains no reference to Plaintiff complaining of being hit by an officer on his way to the ADC.  (Id. Ex. A.)  The evidence submitted by Defendants coupled with Plaintiff's failure to provide any evidence showing he suffered serious injuries during his apprehension or detention, demonstrates that the force used to arrest and detain Plaintiff was not excessive.  Thus, no constitutional deprivation resulted from the application of that force.  Therefore, the Court finds that Defendants are entitled to summary judgment as a matter of law as to this claim.

### 2.    Trespass, False Arrest, and False Detention Claims

If probable cause is present, it is not necessary to consider an immunity defense to Plaintiff's claims of trespass, false arrest, and false detention claims. Garionis v. Newton, 827 F.2d 306, 309 n.5 (8th Cir. 1994); Foster, 914 F.2d at 1079. Here, Magistrate Judge Boylan has already established the search warrant to be based upon probable cause.  Upon entering Plaintiff's house, officers discovered evidence that ultimately resulted in Plaintiff's arrest and conviction on felony charges.  Thus, his claims for trespass, false arrest, and false detention are contradicted by admissible evidence.  Plaintiff has made no effort to reubt this evidence or otherwise show the existence of a genuine issue as to any material fact.  Therefore, the Court finds that Defendants are entitled to summary judgment as a matter of law as to this claim.

### 3.    Property Damage Claims

Defendants do not dispute that items in Plaintiff's house were destroyed as a result of their entry and search of the property.  Officers executing search warrants on occasion must damage property in order to perform their duties.  <u>Dalia v. United States</u>, 441 U.S. 238, 258 (1979).  To be constitutional, "any destruction caused by law enforcement officers in the execution of a search or an arrest warrant must be necessary to effectively execute that warrant."  <u>Ginter v. Stallcup</u>, 869 F.2d 384, 388 (8th Cir. 1989) (per curiam).  To determine whether such destruction rises to the level of a constitutional violation, courts look to the reasonableness of the search.  <u>See</u> <u>id.</u>; <u>Tarpley v. Greene</u>, 684 F.2d 1, 9 (D.C. Cir. 1982).

In his answers to Defendants' interrogatories, Plaintiff claims that his front door was destroyed, plants were destroyed, walls had holes kicked in them, air vents were removed, food such as cereal, flour, and sugar was poured on the floor, clothing was scattered, some chairs were broken, his bathroom had the sink and cabinet ripped away from the wall, dresser drawers were smashed, and blood and grape jelly were spattered about the house.  (Doc. No. 85 Ex. C at 10.)  This claim fails because Plaintiff fails to set forth any admissible evidence that demonstrates unreasonable property destruction. Moreover, a variety of factors make the destruction Plaintiff claims, even if proven, reasonable under the circumstances.  First, the officers were authorized to use an unannounced entry at night, which explains the destruction of the broken door.  They also encountered the pit bulls the officers had been told were aggressive.  In a sworn affidavit, one of the officers encountering the pit bulls indicates the dogs were aggressive and shots were fired to stop the dogs from advancing.  (Doc. No. 89 ¶¶ 12-

18.)  Surely, in a scene where some officers were wrestling with Plaintiff in an upstairs bathroom and others were attempting to secure the remainder of the house quickly —because of the presence of a gun and because some of the criminal evidence sought could be easily destroyed—while encountering aggressive dogs, it is reasonable to expect some of Plaintiff's property would be destroyed.  Third, the items the officers were authorized to search for included small and easily concealed items that would necessarily require disrupting some of the other items Plaintiff lists as having been scattered, poured, and otherwise altered from their state prior to the execution of the search warrant.  (Doc. No. 85 Ex. A at 5.)

Finally, Plaintiff's unsupported claims that the Minneapolis Police Department failed to secure his house is challenged with sworn testimony by Sergeant Schmidt that he called a business called Board Up Plus on the day of the execution of the search warrant and that the business secured the Plaintiff's house.  (Doc. No. 86 ¶¶ 9-10.) Therefore, the Court finds that Defendants are entitled to summary judgment as a matter of law as to these property damage claims.

### 4.    Killing of Plaintiff's Dogs

Shooting and killing a person's dog is a meaningful interference constituting a seizure under the Fourth Amendment.  Fuller v. Vines, No. 96-15842, 1997 WL 377162, *1 (9th Cir. 1997), cert. denied, 522 U.S. 1077 (1998); Hatch v. Grosinger, Civ. No. 01-1906 (RHK/AJB), 2003 WL 1610778, *4 (D. Minn. Mar. 3, 2003).  Defendants concede they shot and killed four of Plaintiff's five pit bulls when they executed the search warrant (Doc. No. 84 at 3-4) and that an officer investigating a burglary call at the residence seven days later shot and killed the remaining dog (Doc. No. 89 ¶¶ 19-

24

22).  While Plaintiff claims to know the events surrounding the shooting of his dogs,

Plaintiff did not witness any of the shootings.  Plaintiff's Complaint and his own

responses to Defendants' interrogatories indicate that, when four of his dogs were killed

on August 15, 2003, Plaintiff was upstairs—well away from his dogs—and, at the time,

entering or exiting his roof, being attacked by officers, or unconscious.  (Doc. No. 85

Ex.C at 4-5.)  Nor does Plaintiff claim he witnessed the shooting of the fifth dog on

August 21, 2005.  There is no evidence in the record that supports Plaintiff's claim that

he witnessed the events precipitating the shooting of his dogs.  Plaintiff provides no

other admissible evidence that would support his version of the events.  On the other

hand, there is evidence that the dogs were aggressive and that they were shot by the

officers in self-defense and in accord with Minneapolis Police Department policies.  (See

Doc. No. 89 ¶¶ 12-18.)

        In order for the warrantless seizure of Plaintiff's dog to be constitutional, the

taking must be reasonable.  "[T]he 'reasonableness' inquiry in an excessive force case

is an objective one: the question is whether the officers' actions are 'objectively

reasonable' in light of the facts and circumstances confronting them, without regard to

their underlying intent or motivation.  Graham v. Connor, 490 U.S. 386, 397 (1989).  The

question for the Court is whether the killing of these dogs, under the circumstances of

each killing, was objectively reasonable.  When an officer decides to shoot and kill a

dog in order to protect himself or another, the officer's actions are objectively

reasonable.  Altman v. City of High Point, 330 F.3d 194, 206-07 (4th Cir. 2003).  The

officers have presented unrebutted evidence that they shot the dogs to protect

themselves.  Therefore, the Defendants are entitled to summary judgment as a matter

of law as to this claim.

### 5.    State Law Claims

To the extent Plaintiff sets forth any state law claims as the basis for relief on his allegations, the Court finds these claims are barred because the police officers were imbued with official immunity in carrying out the search warrant, in arresting Plaintiff, and in detaining him.  This is so because these duties require the officers to exercise their judgment or discretion.  Johnson v. Morris, 453 N.W.2d 31, 41 (Minn. 1990); Elwood v. Rice County, 423 N.W.2d 671, 677 (Minn. 1988).  Therefore, the Court finds that Defendants are entitled to summary judgment as a matter of law as to any state law claims he raises.

### C.    Plaintiff's Motion Requesting Stay On All Proceedings (Doc. No. 111)

On October 26, 2005, Plaintiff filed a motion "requesting a stay on all proceedings" because he claimed (1) the Eighth Circuit Court of Appeals had issued a mandate requiring his presence in the District of Minnesota (he apparently was housed in a federal prison in Wisconsin at the time; (2) he was not going to be allowed take his personal belongings, including legal papers, with him to the District of Minnesota.  (Doc. No. 111 at 1.)  First, the Court finds that Plaintiff's motion for a stay does not bear on Defendants' summary judgment motions or justify his failure to respond properly to the motions.  This Court ordered Plaintiff's response to Defendants' summary judgment motions be filed by July 20, 2005.  (Doc. No. 96.)  Plaintiff did not request his stay until three months after this deadline had passed.  (See Doc. No. 111.)

Second, the Court recommends dismissing as moot Plaintiff's motion for a stay of these proceedings.  Plaintiff requested a stay of these proceedings for "at least eight to

twelve weeks."  (<u>Id.</u> at 2.)  It has been thirteen weeks since Plaintiff's request and no substantive activity has occurred in this case, so the Court finds that Plaintiff's motion for a stay should be dismissed as moot.  Further, on January 23, 2006, Plaintiff filed a "Notice of Return and Appearance From Stay of Relocation."  (Doc. No. 116.) Assuming Plaintiff was transferred to the District of Minnesota after October 26, 2005, this notice makes clear that Plaintiff has been returned to a federal prison in Wisconsin. (<u>Id.</u>)  Therefore, Plaintiff's motion for a stay should be denied as moot.

**THEREFORE, IT IS HEREBY RECOMMENDED that:**

1.  Defendant Patrick McGowan's Motion for Summary Judgment (Doc. No. 64) be **GRANTED**;

2.  Defendants Andrew Schmidt, Officer Garmen, E-R Team, and Officer Blauert's Motion for Summary Judgment (Doc. No. 83) be **GRANTED**;

3.  Plaintiff's Motion Requesting Denial of Defendant Sheriff Patrick D. McGowan's Motion for Summary Judgment (Doc. No. 104) be **DENIED**;

4.  Plaintiff's Motion Requesting Stay On All Proceedings (Doc. No. 111) be **DENIED**; and

5.  All of Plaintiff's claims and this entire action be **DISMISSED WITH PREJUDICE**.

Dated:   February 1, 2006

　　s/ Susan Richard Nelson　　　　　
SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 17, 2006,** a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Circuit Court of Appeals.